Argued and submitted February 22; in Case No. 03C40502, convictions for fourth-degree assault vacated; remanded with instructions to enter judgment of conviction for one count of fourth-degree assault in Case No. 03C40502, reflecting that defendant was convicted on both charged theories and for resentencing; otherwise affirmed; Case No. 03C42414, affirmed June 28, petition for review denied December 5, 2006 (342 Or 117)

## STATE OF OREGON,
*Respondent,*

*v.*

## PHARANN MIKE YONG,
*Appellant.*

03C-40502, 03C-42414;
A121795 (Control), A121796
(Cases Consolidated)

138 P3d 37

John L. Susac, Deputy Public Defender, argued the cause for appellant. With him on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Carolyn Alexander, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Ortega, Judge.*

BREWER, C. J.

---

\* Ortega, J., *vice* Ceniceros, S. J.

**BREWER, C. J.**

Defendant appeals his convictions for stalking, ORS 163.732; two counts of felony assault in the fourth degree, ORS 163.160; interference with making a report, ORS 165.572; and unlawful use of a weapon, ORS 166.220. He assigns error to the admission of evidence that the trial court determined qualified as an excited utterance, OEC 803(2); the admission of prior crimes evidence concerning his previous domestic assault and menacing convictions, OEC 404(3); and the entry and imposition of separate convictions and sentences on the two fourth-degree assault charges. Relying on *Blakely v. Washington,* 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), and *Apprendi v. New Jersey,* 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), defendant also challenges dispositional and durational departure sentences that the trial court imposed on three of the convictions. We affirm in part, vacate in part, and remand.

Because a jury convicted defendant, we view the evidence in the light most favorable to the state. *State v. Barone,* 329 Or 210, 212, 986 P2d 5 (1999), *cert den,* 528 US 1086 (2000). In Case No. 03C40502, defendant was charged with two counts of felony fourth-degree assault, interference with making a report, and unlawful use of a weapon. Each of those charges stemmed from an incident that occurred on January 11, 2003. The first assault count alleged as a predicate that defendant previously had been convicted of assaulting the same victim, who was defendant's girlfriend. ORS 163.160(3)(a). The second assault count alleged that defendant committed the assault in the immediate presence of the victim's child, who witnessed the assault. ORS 163.160(3)(c). In Case No. 03C42414, defendant was charged with stalking based on acts that occurred between January 1 and January 20, 2003, and first-degree criminal trespass arising from an incident involving the victim that occurred on January 16, 2003. The cases were consolidated for pretrial and trial proceedings.

In a pretrial omnibus hearing, the state sought to admit under OEC 803(2) the victim's statements to an emergency dispatcher and to the police officer who responded to a

9-1-1 call that she made on January 16. In the call, the victim reported that defendant, her former boyfriend, was pounding on the front door of her residence, trying to gain entry. She told the emergency dispatcher that she wanted to remain anonymous because defendant did not know that she had a telephone, and she was afraid that he would take it from her if he found out. The victim reported that defendant had brought a baseball bat to her house the previous Saturday and had tried to take their infant son away with him.

When Officer Coyle arrived at the residence approximately four minutes after the victim called 9-1-1, he found the victim "visibly upset, shaking, very worried, [and] pacing." Coyle stated that "[i]t was obvious that something traumatic had happened to her." According to Coyle, the victim told him that five days earlier, on January 11, defendant had come to the residence and yelled at her in the living room in the presence of her grandmother and her child. Defendant had become enraged and had begun smashing things. The victim and her grandmother were frightened. When the victim said she was going to call the police, defendant had smashed the phone with the baseball bat. Defendant had then grabbed the child, gone outside, and stood in the cold for 20 minutes, telling the victim that he was going to take the child away from her.

Defendant had then come back inside the residence, and he and the victim went into the bedroom. The victim told Coyle that she had gone into the bedroom "to keep the violence away from her grandmother." While they were in the bedroom, defendant had thrown the victim down, pinned her, and continued to yell at her. The victim had then "curled up into a ball" as defendant knelt over her and punched her. The victim had told defendant that she would not call the police if he left then.

During their conversation, Coyle observed bruises on the back of the victim's left biceps and on her right knee. The victim confirmed that she had received the bruises during the assault on January 11. She told Coyle that she had substantial pain in the back of her leg as a result of the punches. Coyle determined that a 9-1-1 call had been made from the victim's residence on January 11 but that, when an

officer arrived, the victim told him that her child had been playing with the phone.

Coyle also testified about the victim's statements concerning the January 16 incident. According to the victim, on that date defendant came to the residence and demanded various items of property. While inside, defendant began to collect things and demanded that the victim allow him to sleep on the couch. The victim told Coyle that she had told defendant "on multiple occasions prior to this to stay away from her and her home." Coyle testified that the victim "stated that she was afraid of [defendant], as he had previously assaulted her." Coyle retrieved the baseball bat that defendant had used during the January 11 incident. Thereafter, the victim obtained a stalking protective order and a restraining order against defendant.

The victim later recanted her statements to Coyle in an affidavit that she provided to defendant's attorney. In the affidavit, the victim averred that defendant was not her "former boyfriend," that she was living with him on January 11, and that he had not taken the child outside for 20 minutes. She also denied telling Coyle that she was afraid of defendant. She stated that she had started an argument with defendant about a telephone call that he had received and that she then "became an aggressor." According to the victim, defendant did not punch her or cause any of the bruises on her body, except the one on the back of her arm that he inflicted while trying to restrain her "aggression" against him. The victim summarized that "[defendant] did not do those things to me that were reported, nor did I say to Officer Coyle on January 16, 2003[,] that he did."

The state argued at the omnibus hearing that the victim's statements to Coyle were admissible under OEC 803(2) as excited utterances. The trial court ruled the statements admissible. It found:

> "The testimony—first of all, Exhibit 1 is the 911 tape of the call made by the alleged victim in this case, * * * regarding the defendant being at her home on January 16th. She relates to another incident that had occurred which causes her concern. Officer Coyle arrives shortly thereafter and

specifically he finds that she is visibly upset, shaking, worried, pacing and that she could not keep her hands still. She talks specifically of the events which occurred, in her words, on January 11th, five days before. * * * The question in this case, there are several, was there a startling event or condition. The Court finds, yes regarding the acts on both the 16th and the 11th. The next question is, was there—was the stress or excitement of the [victim], caused by the event or condition, and finally whether the statement must relate to the startling event or condition. What we have is [the victim], according to the officer, visibly upset because [defendant] is at her residence. It appears to cause her unease and her fear and her worry was an incident that occurred five days before, an incident in which there was a 911 hangup in which [the victim] did not report at that time. The Court finds that there—the statements made by [the victim] regarding the alleged assault are sufficient[ly] related to the complaint of stalking and criminal trespass. Criminal trespass is what Officer Coyle was investigating. The implication is that she was worried that he intended to harm her again or threaten her again. Therefore, the motion to allow the statements, the 911 tape and Officer Coyle's testimony regarding [the victim's] statements are allowed as to the case involving stalking and criminal trespass."

The court also determined that the statements were admissible in Case No. 03C40502, involving the January 11 incident:

"I believe that the fact that [defendant's] presence at her home * * * triggered the fear of the prior incident and then that constitutes her being under—still under, even five days before, the influence of the prior incident, that startling event. Therefore, the evidence is admissible as to the other charges of January 11th."

At the omnibus hearing, the state also sought to introduce evidence of defendant's previous convictions for domestic assault and menacing for noncharacter purposes under OEC 404(3) to show, as between defendant and the victim, the identity of the aggressor and, further, to show that defendant acted intentionally, not recklessly, in engaging in the charged conduct. The trial court ruled that the evidence was admissible for the reasons that the state advanced.

At trial, Coyle testified regarding the statements that the victim made to him on January 16. The victim later testified that defendant had assaulted her previously in 1998, and she admitted that she had told an investigating officer in October 1998 that she did not want defendant arrested for fear that he might retaliate against her. However, the victim stated that she was not afraid of defendant, because she could "always just dial 911 and they'll take care of it," and that, even though defendant could hit her and bruise her, she did not think he would ever hurt her so badly that she could not reach the phone. The victim also testified that she was the aggressor in the January 11, 2003, incident, because she pushed defendant.

In his own defense, defendant testified that he did not strike the victim during the January 11 incident but merely tried to restrain her from hitting him. On cross-examination, the prosecutor asked defendant about his previous convictions. Defendant admitted those convictions. During closing argument, the prosecutor argued that defendant's previous convictions reflected adversely on his credibility. The jury convicted defendant of all counts except the criminal trespass charge in Case No. 03C42414. The state asked the court to impose both consecutive and departure sentences on the fourth-degree assault and unlawful use of a weapon convictions. Observing that defendant had several previous convictions that had not deterred him from committing the charged offenses, the court imposed sentences in accordance with the state's recommendation.

We first address defendant's argument that the trial court erred in admitting the victim's statements to the investigating officer under the excited utterance exception to the hearsay rule. OEC 803(2) authorizes the admission, as an exception to the hearsay rule, of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In *State v. Carlson*, 311 Or 201, 808 P2d 1002 (1991), the Supreme Court discussed the excited utterance exception in detail and explained that, for a statement to fall within its scope, the trial court must conclude by a preponderance of the evidence that three elements are satisfied: (1) a startling event or condition must have occurred; (2) the statement

must have been made while the declarant was under the stress of the excitement caused by the event or condition; and (3) the statement must relate to the startling event or condition. *Id.* at 215 (citing Laird C. Kirkpatrick, *Oregon Evidence* 533 (2d ed 1989)).

■. The trial court finds the facts that underlie the application of OEC 803(2), and we will not disturb those findings if evidence in the record supports them. *State v. Cunningham*, 337 Or 528, 538, 99 P3d 271 (2004), *cert den*, 544 US 931 (2005). However, the ultimate legal issue—whether the requirements of OEC 803(2) have been met and the hearsay statement is therefore admissible as an excited utterance—is a question of law as to which there is only one legally correct outcome. *Id.* Thus, an appellate court reviews the trial court's legal conclusion that a statement is or is not an excited utterance as a matter of law.

■ Defendant does not contend that the statements that the victim made to the emergency dispatcher and Coyle on January 16 fail to satisfy the first requirement under OEC 803(2).[1] Defendant's challenge, rather, is based on the second and third requirements of the rule. We address those arguments in turn.

Defendant first asserts that the statements the victim made on January 16 about the January 11 altercation were not made under the stress or excitement of the earlier incident. According to defendant,

"[t]he statements were made * * * a full five days after the incident in question. [The victim] spoke with defendant about the incident the next day, which indicates that she in fact thought about the incident before she made the statements to Officer Coyle on January 16. Furthermore, the statements at issue were not spontaneous, but instead,

[1] With appropriate deference to the trial court's findings of fact, we likewise conclude that the January 16 incident qualified as a startling event. Defendant twice previously had been convicted of assaulting the victim and, on the occasion at issue, defendant pounded on her door while demanding entrance and repeatedly refused to leave. Those facts were sufficient to render the events of January 16 startling to the victim.

were responsive to Coyle's questioning. Also, those statements were not made at the first opportunity to describe the January 11 incident."

In *Carlson*, the Supreme Court described the rationale underlying the second requirement for the admission of a statement as an excited utterance:

"The spontaneity-of-the-utterance requirement, *i.e.*, the requirement that the statement of the declarant be 'made while the declarant was under the stress caused by the event or condition,' has both a *causal* and a *temporal* dimension. The declarant's excitement must have been caused by the startling event, and the declarant's statement must have been made while the excitement persisted. * * * Criteria that bear on the trial court's determination of the spontaneity of the utterance are 'lapse of time, place, content of the utterance, physical or mental condition of the declarant, whether made in response to an inquiry, and presence or absence of a motive to fabricate.' "

311 Or at 218 (citations and footnote omitted; emphasis in original).

In several pertinent respects, the circumstances in this case are similar to those in *State v. Stonaker*, 149 Or App 728, 945 P2d 573 (1997), *rev den*, 327 Or 123 (1998). In that case, the defendant also was charged with domestic assault. On the evening in question, the defendant and his girlfriend, the complainant, were at a party at an acquaintance's home. During the evening, the defendant became involved in a fight outside the home with three other people. The defendant came into the house "in a panic," without his shirt on, and told her to "get [her] stuff. We gotta go." *Id.* at 730. During the ride home, which took about 45 minutes, the defendant yelled and hit the dashboard, the window, and the seat beside him. When they were about 15 minutes from their home, defendant hit the complainant on her leg, arm, and mouth, giving her a swollen lip. *Id.*

At sometime afterward and before they arrived home, the complainant showed the defendant her swollen lip. He pulled the car over, began to cry, said he was sorry, and calmed down. Shortly after they returned home, the complainant played back the messages on a telephone answering

machine, including a greeting from a male friend of hers. On hearing that message, the defendant said, "That's not okay, that's just not okay." *Id.* at 731. The complainant testified that she then saw a gun case in front of the defendant, heard a "click," and "took off running[.] I didn't know what his intentions were. If he was mad at me, or just mad or if he was going to hurt himself, or me, or go back to the party." *Id.* The complainant ran to a neighbor's house, "somebody that had their lights on," asked to use the neighbor's phone, and called 9-1-1. The time between when the complainant heard the click and when she initiated the 9-1-1 call was approximately 30 seconds. *Id.*

The entire 9-1-1 call took four minutes and 45 seconds. No more than five minutes after the call ended, police officers arrived. The complainant told one of the officers that her boyfriend had "backhanded" her in the mouth while they were driving home and that, when they got home, her boyfriend became extremely upset about a phone message she had received from a male friend. *Id.* at 735-36. The complainant told the deputy that her boyfriend went into the bedroom, she heard him "knocking around the rifle case," and then she ran out of the house. *Id.* at 736.

The state sought to admit both the tape of the 9-1-1 call and the complainant's statements to the officer, arguing that those hearsay statements were admissible as excited utterances. The state argued that both the backhand slap and the gun case incident were "startling events" for purposes of OEC 803(2), and that the complainant was under the "stress of excitement" caused by those events when she made the 9-1-1 call and when she spoke to the officer. *Id.*

The trial court found that the complainant's 9-1-1 statements were not spontaneous based on a permutation or combination of three factors: (1) the lapse of time between the incidents and the call; (2) the fact that the complainant answered the 9-1-1 operator's questions calmly; and (3) the fact that the complainant's statements were in response to direct questions.

On appeal, we noted that the third factor on which the trial court had relied—that the complainant's statements

were made in response to the 9-1-1 operator's direct questioning—was specifically mentioned in *Carlson*, 311 Or at 218. But we distinguished the circumstances from those in *Carlson*:

> "[T]he 'response-to-inquiry' factor must be viewed in the totality of the circumstances. Here, it is apparent that, because of the question-and-answer format of the 9-1-1 call, many of the complainant's statements were, of necessity, given in the form of a response. However, many of the complainant's most descriptive statements concerning the alleged assault and gun case incidents were not, in fact, 'responsive'—that is, they included volunteered information that was not responsive to the question asked. Moreover, the strength of the 'response-to-inquiry' factor may vary depending on the nature and context of the inquiry; here, the complainant's initial description of the alleged assault followed the operator's open-ended question, 'What is the problem?' "

*Stonaker*, 149 Or App at 741-42 (citations and footnotes omitted).

We noted, moreover, that the factors that the trial court identified were not the only factors established in the record that were material to the second *Carlson* requirement. In particular, there was uncontroverted evidence that the complainant made the 9-1-1 statements after she saw her boyfriend angrily open a gun case in response to a phone message that she had received from another male friend; the complainant made the statements immediately after she had fled her own home late at night and had run to the next nearest house with lights still on; the complainant was initially incoherent and in tears; and the complainant indicated more than once, without prompting from the 9-1-1 operator, that she was scared. *Id.* at 742.

Viewing the record as a whole, we concluded that the trial court correctly determined that the complainant's statements to the 9-1-1 operator were not made while she was under the stress of the alleged "backhand" assault. The temporal lapse, the nature of the intervening interaction between the complainant and defendant, and, particularly, the fact that the complainant did not attempt to call 9-1-1 immediately after returning home but, instead, made that

call only after the gun case incident, were especially pertinent to that conclusion. *Id.* at 742.

Conversely, we concluded that the complainant was still under the stress of the gun case incident not only when she initiated the 9-1-1 call, but throughout that call. That conclusion flowed primarily from our disagreement with the trial court as to the weight to be given to the complainant's "calm" affect and the "response-to-inquiry" factors, when those factors were viewed in their entire context. *Id.* at 742-43.

Finally, we considered the trial court's exclusion of the complainant's subsequent statements to the investigating officer. In concluding that those statements were not admissible under the excited utterance exception, the trial court found, and emphasized, that, by the time the complainant spoke to the officer, she was calmer than she had been in speaking to the 9-1-1 operator and that an additional three to five minutes had elapsed. We concluded that, given those facts as found by the trial court, as well as the additional fact that complainant had already spoken to the 9-1-1 operator about the same events, her statements to the officer did not meet the second, "spontaneity" requirement. Accordingly, we concluded that the trial court had properly excluded those statements. *Id.* at 744-45.

■    Here, as in *Stonaker*, we conclude that the victim was under the stress of excitement of the January 16 episode when she made the 9-1-1 call. The tape recording of the 9-1-1 call showed that the victim made the call while defendant was at her door. In response to the dispatcher's question, the victim said that defendant was ringing the doorbell, and that he then sneaked around to the back of the house. During the call, defendant eventually returned to the front of the house and resumed ringing the doorbell. As in *Stonaker*, in the totality of circumstances, we do not place significant countervailing weight on the fact that some of the victim's statements to the operator were prompted by questions. Much of the information that the victim provided was volunteered, not responsive, and she was under the influence of stress caused by the excitement of defendant's presence throughout

the call. In short, we readily conclude that the stress of excitement that the victim evinced throughout the call to the 9-1-1 dispatcher was sufficient to satisfy the second *Carlson* requirement.

■    Moreover, unlike in *Stonaker*, we conclude that the stress of that excitement persisted while the victim made the statements to Coyle. The evidence supports the trial court's finding that, when she made the statements to Coyle, the victim remained under the stress of excitement caused by defendant's presence at the residence. As discussed, Coyle testified that he found the victim "visibly upset, shaking, very worried, [and] pacing." Coyle stated that "[i]t was obvious that something traumatic had happened to her." Thus, unlike the complainant in *Stonaker*, there was evidence that the victim was not calm when the officer arrived, and she was still speaking to the dispatcher. In *State v. Moen*, 309 Or 45, 60, 786 P2d 111 (1990), the Supreme Court noted that, under the identical federal rule, "[c]ontinuing emotional * * * shock * * * or unabated fright * * * and other factors may prolong the impact of a stressful event, making it proper to resort to Rule 803(2) despite long lapses of time." (Quoting David W. Louisell & Christopher B. Mueller, 4 *Federal Evidence* § 439, 506 (1980).) Here, the victim's unabated fright had persisted over a short interval of time—no more than a few minutes— before she made the statements to Coyle. Because she remained under the stress of excitement caused by defendant's conduct, we conclude that those statements also satisfied the second *Carlson* requirement.

Turning to the third *Carlson* requirement, defendant argues that the statements the victim made on January 16 about the January 11 incident did not relate to the startling event on January 16. Again, *Stonaker* informs our analysis. In that case, we considered whether the complainant's 9-1-1 statements "relat[ed] to the startling event," that is, the gun case incident. 149 Or App at 743. Because all of the complainant's statements describing the gun case incident satisfied that requirement, we narrowed our inquiry to whether the complainant's statements describing the alleged "backhand" assault were also sufficiently related to the gun case incident to be admissible. We concluded that they were:

"No Oregon decision has addressed the scope and content of the 'related to' requirement. However, a leading commentator has observed with respect to the identically worded federal rule: 'If the subject matter of the statement is such *as would likely be evoked by the event,* the statement should be admitted.' 5 *Weinstein's Federal Evidence,* § 803.04[5] (2d ed 1997) (emphasis supplied; footnote omitted)."

149 Or App at 743. In a footnote, we elaborated:

"McCormick also states that the 'terminology is intended to extend beyond merely a description or an explanation of the event.' 2 *McCormick on Evidence,* § 272, at 220. As an example of that principle, McCormick cites *People v. Ojeda,* 745 P2d 274 (Colo App 1987), in which the court found admissible a statement by the victim regarding a conversation with the defendant that had occurred five months before the attack. In that conversation, the defendant learned that the victim would be alone. The court concluded that the memory of that conversation would likely have been evoked by the attack. 2 *McCormick on Evidence,* § 272, at 220-21 n 34."

149 Or App at 743 n 6. We continued:

"We find that view to be persuasive. Applying that principle to this case, we conclude that the complainant's statements regarding the alleged assault were sufficiently related to the gun case incident. That conclusion flows primarily from our belief that, given the assaultive character of the two incidents and the relatively short time period between the two—approximately 15 minutes—the latter was 'likely to evoke' the former. That is, in the first incident, defendant, provoked by anger, assaulted the complainant; and in the second, precipitating incident, defendant, again provoked by anger, engaged in actions that suggested to the complainant that he intended to harm her *again.* Indeed, the facts strongly suggest that the complainant reacted to the 'click' in the manner she did largely because of the earlier alleged assault. Thus, complainant's statements describing the earlier alleged assault were 'relat[ed] to' the startling event."

*Id.* at 743-44 (emphasis in original).

■      *Stonaker* confirms that a statement about an earlier incident, such as the January 11 incident in this case, can sufficiently relate to a later startling event so as to qualify as an excited utterance despite a substantial lapse of time. In this case, the time lapse was five days. As discussed, in *Stonaker*, we cited with apparent approval a case in which a five-month time lapse was not deemed too great to prevent the statement about an earlier event from relating to a later startling event. *Id.* at 743 n 6. Here, the trial court found that the January 16 event triggered the victim's memory of the January 11 event:

> "I believe that the fact that [defendant's] presence at her home * * * triggered the fear of the prior incident and then that constitutes her being under—still under, even five days before, the influence of that prior incident, that startling event. Therefore, the evidence is admissible as to the other charges of January 11th."

The trial court's finding is supported by the evidence and binds us on review. However, we reach two legal conclusions that differ from the conclusion that the trial court drew from that finding. First, as noted, it is not the January 11 incident that qualified as a startling event on January 16. Rather, the later January 16 incident, which the trial court also found was startling, was the qualifying event. That incident, as the trial court found, triggered the victim's fearful recollection of the January 11 incident. Second, as we now explain, because the two events began similarly, and the fearful memory that the first incident left would naturally be evoked by the later event, the first event was sufficiently related to the second to satisfy the final *Carlson* requirement.

As discussed, in *Stonaker*, we found persuasive Judge Weinstein's observation with respect to the identically worded federal rule that, "[i]f the subject matter of the statement is such *as would likely be evoked by the event*, the statement should be admitted." 149 Or App at 743 (emphasis in original). In doing so, we adopted the prevailing construction of the identical federal rule in ascertaining the meaning of the "related to" requirement of OEC 803(2). It was permissible to do so. *See Cunningham*, 337 Or at 543 n 6 (stating that it is permissible to look at federal authorities interpreting FRE 803(2), the federal excited utterance exception, in

construing its Oregon counterpart). In addition, we cited McCormick's treatise for the proposition that the "related-to" terminology "is intended to extend beyond merely a description or an explanation of the event." *Stonaker*, 149 Or App at 743 n 6. We apply that formulation here.

Our conclusion in *Stonaker* that the complainant's statements about an earlier incident related to a later startling event hinged on two factors: First, the assaultive character of the two incidents and, second, the relatively short time period between the two—approximately 15 minutes. The first factor is present here, that is, the later event was similar to the preassaultive stage of the first event. However, here, the time period between the two events, five days, was much longer than the 15-minute time period in *Stonaker*. Accordingly, unlike *Stonaker*, this case squarely presents the issue whether a statement concerning an earlier event separated by a matter of days from a later startling event can be such as would likely be evoked by the latter.

In *Ojeda*, the Colorado case that we cited in *Stonaker*, the victim of an attempted sexual assault had been engaged in conversation by the defendant five months before the assault. During that conversation, the defendant had determined when the victim would be home alone and ascertained her parents' work schedules. Immediately after the attempted assault, in an interview with an officer, the victim told him of the conversation she had had with the defendant five months earlier. At trial, the officer testified to those statements. In construing the applicable Colorado rule, which was based on the federal excited utterance rule, the court noted that "[o]nly the slightest sort of relationship between a subject matter and the event is required." 745 P2d at 276. The court held that

> "if the subject matter of the statement is relevant and *would likely be evoked by the startling event,* even though a portion of the statement relates to a past fact, the entire statement should be admitted. This determination cannot be made mechanically without assessing the facts of the particular case.
>
> "The subject matter of the statement here is relevant *and would likely be evoked by the startling event.* * * *

"Thus, even though this small portion of the victim's statement related to a past fact, it was nevertheless an excited utterance *because the significance of the past fact was revealed as a result of the excitement of the event.*"

*Id.* (citations omitted; emphasis added).

In *Matter of Troy P.*, 114 NM 525, 842 P2d 742 (1992), the court addressed a similar situation. When a child declarant's mother attempted to take the child to her father's house, the child became upset, began to scream that she did not want to go, and, when asked why not, said, "That boy touches me * * * Pauline's son." *Id.* at 746. The court first noted that the statement had occurred several weeks after the abuse. It stated:

"Events may so deeply traumatize a person that long after stress has subsided a chance reminder may have enormous psychological impact, causing renewed stress and excitement and educing utterances relating to the original trauma. Courts have, therefore, admitted spontaneous utterances made well after the event when the declarant was suddenly subjected to rekindled excitement.

"* * * * *

"* * * [W]e believe the imminent return of the victim to her father could support admission of her statements as an excited utterance."

*Id.* at 746-47 (citations and internal quotation marks omitted).

In *United States v. Moore*, 791 F2d 566 (7th Cir 1986), the defendant had been charged with fraud involving bid applications. A coworker suspected that the crime had occurred but had been unable to discover evidence of it until the defendant carelessly disposed of rigged bid sheets in a trash can. When the coworker later discovered the evidence, she called another worker over to see what she had discovered and said, "I've found the evidence I've been waiting for for a long time." *Id.* at 570. The evidence showed that she was very excited over the evidence's discovery. The coworker died before trial and her statement was admitted as an excited utterance. The court noted that "caselaw indicates that even

statements that refer to prior events or thoughts may be admissible as excited utterances." *Id.* at 572.

Summarizing the third element of the inquiry, to ensure that a hearsay statement is not the product of conscious reflection or fabrication and therefore that it is sufficiently reliable that the declarant need not be called to testify to it, there must be either a direct or indirect relationship between a previous event and a later startling event, such that the latter is likely, under the stress of excitement that it has generated, to evoke an exclamation about the former.[2] We perceive such a relationship between the startling event in this case and the victim's statements about the earlier incident.

In the first incident, defendant, provoked by anger, assaulted the victim; in the second event defendant, again motivated by anger, engaged in conduct suggesting to the victim that he intended to harm her again. Defendant had assaulted the victim multiple times, including on two occasions that led to convictions in 1998, and always when provoked by anger. On January 11, 2003, defendant again became enraged, came to the residence, yelled at the victim, made demands of her, and, in a tide of escalating violence, eventually assaulted her. On January 16, defendant returned to the residence, pounding on the door, demanding various things from her, and insisting that she allow him to sleep on the couch. Although the victim had told him to stay away, he continued to force the issue. With defendant's history of assaulting her when he became enraged—the last time only five days earlier—it is reasonable to conclude that the incident on January 16 likely evoked the victim's statements about the assault on January 11.

The fact that defendant ultimately did not assault the victim on January 16 is beside the point. Defendant's conduct on that day suggested to the victim that he intended to

---

[2] The "related-to" element is not so elastic as to lack practical limits. Where, for example, the declarant's statement has no logical connection to the subject matter of the pertinent startling event, it is inadmissible. *See, e.g., State v. Harrell*, 348 Md 69, 702 A2d 723 (1997) (holding that declarant's statement, allegedly made under stress of excitement of an assault, that the defendant also had committed theft of an automobile, was not related to the pertinent startling event, that is, the assault).

harm her again. No more is required for the statements to be sufficiently related to the startling event. We conclude that the trial court did not err in admitting into evidence the statements that the victim made to the 9-1-1 dispatcher and to Officer Coyle on January 16.

■ In his second assignment of error, defendant asserts that the trial court erred in admitting evidence of his previous convictions for domestic assault and menacing of the victim and for assault of his former wife. As discussed, the trial court ruled that the evidence was admissible in both cases for two noncharacter purposes under OEC 404(3)—first, to show, as between defendant and the victim, the identity of the aggressor and, second, to show that defendant acted intentionally, not recklessly, in engaging in the charged conduct.

Defendant first argues that the trial court erred in admitting the evidence to establish the identity of the aggressor. According to defendant, identity was not an issue in either case. The state disagrees, arguing that "the precise issue here is identity—who was responsible for the assault on January 11, 2003."

Our analysis in *State v. Baughman,* 164 Or App 715, 995 P2d 551 (2000), *rev dismissed,* 333 Or 596 (2002), undermines the state's argument. In that case, we held that evidence that the defendant had previously told a "bloody bears" story during the commission of sexual abuse of a person other than the alleged victim was not relevant. The state argued that, because the defendant had allegedly told a "bloody bears" story to both persons, the story was evidence of a "signature" crime or of the defendant's identity. However, we pointed out that identity was not an issue in the case; the issue was whether a crime had occurred, not whether the defendant, in contrast to some other person, had committed it. *Id.* at 722. In substance, we reasoned, the only premise for the state's argument was that the similarity of the two events made it more likely that defendant had abused the victim and for assault of his former wife. Because evidence offered for that purpose is propensity or character evidence, which OEC 404(3) expressly excludes, we concluded that the proffered evidence was inadmissible. *Id.* at 723. *See also State v.*

*Osborne*, 174 Or App 88, 92-93, 25 P3d 356 (2001) (applying *Baughman* to exclude evidence that the state offered to prove identity where the state's premise was that, because the defendant abused a different person on a previous occasion, it was more likely that he abused the alleged victim in the present case).

Here, too, the issue was whether a crime occurred, not whether the defendant, in contrast to some other person, committed it. Accordingly, identity was not at issue and, unless the evidence was relevant for a different purpose, it was inadmissible under OEC 404(3).

■ Defendant next argues that the evidence should not have been admitted to establish that he intended to commit the charged offenses because "the issue in this case was whether the alleged act occurred at all. Defendant's defense was that he never assaulted [the victim]. He consistently testified that he never struck her." Defendant relies on the following statement in *State v. Leach*, 169 Or App 530, 534-35, 9 P3d 755 (2000), *rev den*, 332 Or 632 (2001):

"We note, at the outset, that there is a substantial and unresolved question as to whether 'prior bad acts' evidence can ever be admitted as being relevant to intent where, as here, the defense is that the charged crime never occurred. That is, this is not a case of allegedly 'innocent' or 'accidental' ambiguous conduct."[3]

(Footnote omitted.)

Defendant is mistaken. In *Moen*, the Supreme Court explained that, long before *State v. Johns*, 301 Or 535, 725 P2d 312 (1986), was decided, the court had recognized the relevance of a defendant's previous hostile acts toward a victim. The court stated:

---

[3] We did not decide that issue in *Leach*, because we determined that, in any event, the proffered evidence was not admissible to prove the defendant's intent under the five-part test adopted in *Johns*. Here, defendant does not argue that the proffered evidence would fail the *Johns* test if intent were at issue. Accordingly, we do not address that issue. Rather, as discussed, defendant's sole argument is that his intent was not at issue because he denied that he assaulted the victim during the January 11 incident.

"This type of evidence has special relevance to the issue of a hostile motive, which in turn is probative of intent. Evidence that shows a hostile relationship existed between a defendant and his victim tends to shed light on a defendant's *mens rea*. The state had the burden to prove beyond a reasonable doubt that defendant's acts were intentional.

"This court noted in [*Johns*] that '[i]ntent or state of mind is often the most difficult element of a crime to prove because many crimes are unwitnessed and even if a witness is present, the witness can only surmise the actor's state of mind. * * * [T]herefore courts very liberally admit prior crime evidence to prove *mens rea*.' 301 Or at 551.

"In *Johns,* this court permitted the introduction of evidence of the defendant's attempt to kill a different spouse six years earlier because the evidence tended to prove that 'when similarly agitated in a domestic setting defendant will act violently and intentionally.' 301 Or at 551. In parallel fashion, the same inferences may be drawn in this case concerning defendant's mental state during the killings from evidence that shows defendant's intentional reaction under similar circumstances."

*Moen*, 309 Or at 68-69.

That principle applies with equal force in this case. Both defendant and the victim acknowledged in their trial testimony that an altercation occurred between them on January 11. It also was undisputed that the victim suffered physical injury during that incident. According to the victim, she was the aggressor, assaulting defendant by pushing him, trying to punch him in the chest and face, and kicking him "hard" in the back. Defendant testified that he tried to restrain the victim but never struck her. But it was the state's theory that defendant had, in fact, been the aggressor, that he assaulted the victim as he had done in the past, and that the victim changed her story out of fear of retaliation. Here, as in *Johns* and *Moen,* the proffered evidence was admissible because it tended to prove that "when similarly agitated in a domestic setting defendant will act violently and intentionally." *Id.* at 69. That fact was directly relevant to the state's theory, in opposition to defendant's defense,

that defendant was the aggressor in the January 11 altercation. As a consequence, the trial court did not err in admitting the challenged prior crimes evidence.

■    In his third and fourth assignments of error, defendant asserts that the trial court erred in entering separate convictions and in imposing separate sentences on the two fourth-degree assault charges. As discussed, the first count charged that defendant previously had been convicted of assaulting the same victim, ORS 163.160(3)(a), and the second count alleged that defendant committed the assault in the immediate presence of the victim's child, who witnessed the assault. ORS 163.160(3)(c). The state argues in response that ORS 163.160(3)(a) and (c) constitute separate statutory provisions and that, under ORS 161.067(1), the trial court therefore was authorized to enter separate convictions and impose separate sentences for each offense. Defendant replies that, in transgressing ORS 163.160(3)(a) and (c), he did not violate separate statutory provisions. For the following reasons, we agree with defendant.

ORS 163.160 provides, in part:

"(1)    A person commits the crime of assault in the fourth degree if the person:

"(a)    Intentionally, knowingly or recklessly causes physical injury to another; or

"(b)    With criminal negligence causes physical injury to another by means of a deadly weapon.

"(2)    Assault in the fourth degree is a Class A misdemeanor.

"(3)    Notwithstanding subsection (2) of this section, assault in the fourth degree is a Class C felony if the person commits the crime of assault in the fourth degree and:

"(a)    The person has previously been convicted of assaulting the same victim;

"(b)    The person has previously been convicted at least three times under this section or under equivalent laws of another jurisdiction and all of the assaults involved domestic violence, as defined in ORS 135.230; or

"(c) The assault is committed in the immediate presence of, or is witnessed by, the person's or the victim's minor child or stepchild or a minor child residing within the household of the person or victim."

ORS 161.067(1) provides that "[w]hen the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations."

■ In *State v. Barrett*, 331 Or 27, 32, 10 P3d 901 (2000), the Supreme Court held that ORS 167.062(1) "requires *both* that a defendant's acts violate 'two or more statutory provisions' *and* that each 'statutory provision' requires 'proof of an element that the others do not.' "[4] (Emphasis in original.) In addressing the first requirement, a court inquires whether the statutory provisions at issue "address separate and distinct legislative concerns," and whether each constitutes a "single crime." *Barrett*, 331 Or at 34. Each set of provisions must be analyzed separately to determine the legislature's intent for those provisions. *Id.* at 34-36. Only if the defendant's conduct violates two or more statutory provisions does the court "consider whether each statutory provision requires proof of an element that the others do not." *Id.* at 32. In deciding whether the two statutes contain different elements, the court examines the statutory elements of each offense. *State v. Reiland*, 153 Or App 601, 604, 958 P2d 900 (1998).

The Supreme Court's decision in *Barrett* informs our analysis of whether defendant's conduct violated two or more statutory provisions. In *Barrett*, the court concluded that the aggravated murder of a single person under ORS 163.095[5] constitutes a single punishable offense, regardless of whether the defendant violated multiple subsections of the aggravated murder statute in committing the murder:

---

[4] The court referred to *former* ORS 161.062(1), *repealed by* Or Laws 1999, ch 136, § 1, but acknowledged that ORS 161.067(1) is phrased identically, thus expressing the same legislative intent. *Barrett*, 331 Or at 29 n 1.

[5] ORS 163.095 provides, in part, that "[a]s used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances[.]"

"The aggravating factors constitute no more than different theories under which murder becomes subject to the enhanced penalties for aggravated murder. That defendant's conduct in intentionally murdering the victim in this case was 'aggravated' by 'any,' *i.e.*, one or more, act surrounding that conduct does not convert that conduct into more than one separately punishable offense."

*Id.* at 36. Likewise, in *State v. White*, 202 Or App 1, 9, 121 P3d 3 (2005), *rev allowed*, 340 Or 157 (2006), we held that the first-degree kidnapping of a single individual constitutes a single punishable offense under ORS 163.235,[6] even if the defendant committed the kidnapping for more than one statutorily enumerated purpose:

"We agree with defendant that the first-degree kidnapping statute, under the *Barrett* analysis, is indistinguishable from the aggravated murder statute. It is written in a manner that is similar to the aggravated murder statute, in that second-degree kidnapping becomes first-degree kidnapping by 'any' of the enumerated means in the statute. Any or all of the enumerated circumstances operate to enhance second-degree kidnapping to first-degree kidnapping. The multiple intent factors constitute only different theories under which second-degree kidnapping becomes subject to the enhanced penalties of first-degree kidnapping."

Like the aggravated murder statute and the first-degree kidnapping statute, fourth-degree assault is set out in a single section, and the felony aggravation of fourth-degree assault is set out in a single subsection. In *Barrett*, the court explained that "we think that the use of a single section * * * is some indication that the legislature intended to define a single crime." 331 Or at 35. Similarly, the use of a single section to define fourth-degree assault and the use of a single subsection to define when that offense may be elevated to a felony are indications that the legislature intended to define a single crime that has an enhanced penalty under specified circumstances.

---

[6] ORS 163.235(1) provides, in part, that "[a] person commits the crime of kidnapping in the first degree if the person violates ORS 163.225 [the second-degree kidnapping statute] with any of the following purposes[.]"

Moreover, the structure of the subsection defining when fourth-degree assault may be aggravated to a felony is similar to the structures of the statutes at issue in *Barrett* and *White*. Fourth-degree assault may be aggravated to a Class C felony "if the person commits the crime of assault in the fourth degree and" one of the listed circumstances exists. ORS 163.160(3). Although the aggravated murder and first-degree kidnapping statutes use the word "any" before enumerating the circumstances under which those crimes are committed, the use of the term "and" in conjunction with "or" in the felony fourth-degree assault subsection accomplishes the same purpose. In *Barrett*, the court explained that "any" means one or more and concluded that "the first sentence of [the aggravated murder statute] suggests that any or all [of] the enumerated circumstances simply serve to prove the single essential element of 'aggravation.'" 331 Or at 35-36. Similarly, the first sentence of ORS 163.160(3) suggests that the presence of any or all of the enumerated circumstances simply serves to elevate the offense of fourth-degree assault from a Class A misdemeanor to a Class C felony. Thus, if a person commits the crime of fourth-degree assault under one or more of the enumerated circumstances, the crime may be enhanced to a felony.

In short, the text and context of the fourth-degree assault statute indicate that the legislature did not intend to create additional crimes but, instead, intended to more severely punish the same conduct, if committed in a domestic situation, by making it a felony. *See id.* at 35-36 (legislature expressed single legislative intent to punish more severely certain murders that it considered to be especially heinous). Because defendant's conduct did not violate two or more statutory provisions, he could not be separately convicted of, or sentenced on, the two fourth-degree assault charges.

As in *Barrett*, the "appropriate procedure would have been to enter one judgment of conviction reflecting the defendant's guilt on the charge of " fourth-degree assault, which judgment separately would enumerate both of the existing enhancement factors. *Id.* at 37. *See also State v. Acremant*, 338 Or 302, 330, 108 P3d 1139, *cert den*, ____ US ____ , 126 S Ct 150 (2005) (noting *Barrett's* holding that, "when a trial court convicts a defendant of multiple

counts of aggravated murder for the death of a single victim based upon different aggravating circumstances, the trial court should enter only one judgment of conviction of aggravated murder for that victim, with the judgment enumerating each of the supporting aggravating factors"). Accordingly, we vacate defendant's convictions for fourth-degree assault and remand with instructions to enter a single judgment of conviction for fourth-degree assault reflecting that defendant was convicted on both theories, and for resentencing.

Because a remand for resentencing requires resentencing on all counts, ORS 138.222(5), we need not consider defendant's contention that the court violated his Sixth Amendment rights under *Blakely* and *Apprendi* by imposing upward departure sentences on his convictions for unlawful use of a weapon and fourth-degree assault. *See State v. Henson*, 203 Or App 596, 604, 125 P3d 1271, *rev den*, 203 Or App 596 (2006).

In Case No. 03C40502, convictions for fourth-degree assault vacated; remanded with instructions to enter judgment of conviction for one count of fourth-degree assault in Case No. 03C40502, reflecting that defendant was convicted on both charged theories and for resentencing; otherwise affirmed. In Case No. 03C42414, affirmed.